DIAMOND "D" CONSTRUCTION
CORP. Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF LABOR ("DOL") BUREAU OF PUBLIC WORKS; James J. McGowan, Commissioner of Labor of the State of New York; Department of Audit and Control, State of New York; Michael O'Connell, Department of Audit and Control, State of New York; County of Erie; Nancy Naples, Erie County Comptroller; Ronald Kinn, Individually and in His Capacity as Public Work Wage Investigator Em-

ployed by the DOL; Dale Stanley, Individually and in His Capacity as an Employee of the DOL; Brian Robison, Individually and in His Capacity as Senior Public Wage Investigator Employed by the DOL; Defendants.

No. 00–CV–335C.

United States District Court,
W.D. New York.

June 29, 2000.

Killeen & Killeen LLP (Henry W. Killeen, III, of Counsel), Orchard Park, New York, for Plaintiff.

Eliot Spitzer, Attorney General of the State of New York (Pico Paul Ben–Amotz, Assistant Attorney General, of Counsel), New York, New York, for Defendant New York State Department of Labor.

Frederick A. Wolf, Erie County Attorney (George Michael Zimmermann, Assistant County Attorney, of Counsel), Buffalo, New York, for Defendant Erie County.

### DECISION AND ORDER

CURTIN, District Judge.

## INTRODUCTION

By a complaint filed April 21, 2000, plaintiff Diamond "D" Construction Corporation commenced this section 1983 action against the New York State Department of Labor ("the DOL"); James J. McGowan, the DOL's Commissioner ("the Commissioner"); Michael O'Connell, a supervisor with the New York State Comptroller's Office ("O'Connell"); Erie County; Nancy Naples, the Erie County Comptroller; Ronald Kinn, a DOL Public Work Wage Investigator; Dale Stanley, a DOL employee; and Brian Robison, a Senior Public Work Wage Investigator for the DOL. Together with its complaint, plaintiff filed motions for a preliminary injunction and an expedited hearing. Item 2. The court granted plaintiff's motion for an expedited hearing and set a schedule for written arguments on the motion for preliminary injunction. Item 10. Defendants submitted opposing papers on May 12, 2000, and plaintiff replied on May 25, 2000. On June 5, 2000, the court heard argument on plaintiff's motion.

## BACKGROUND

Joseph DiPizio is the principal of Diamond D, which is a construction company that builds roads for public entities like New York State and Erie County. Item 7, ¶ 14. In addition, it is relevant to note that Leo Hopkins works for Diamond D as a job site supervisor and John Gorski serves as an off-site driver for the company. Both Mr. Hopkins and Mr. Gorski are sons-in-law of Mr. DiPizio. *See* Item 7, ¶¶ 72–79. Over the last several years, plaintiff Diamond D has been the general contractor for road construction projects on Greiner Road, Heim Road, Main Street, and Sweet Home Road, all of which are located in Erie County. The New York State Department of Transportation was the so-called "sponsoring agency" on the Heim Road and Main Street projects, *see* Item 7, Exhs. F and S, while the Erie County Department of Public Works was the sponsoring agency for the Greiner Road and Sweet Home Road projects, *see id.* Exh. T and Item 19, p. 4. The present dispute concerns plaintiff's claim that it has not yet been paid for much of its work on these projects.

The State and County have not yet paid plaintiff because of plaintiff's alleged violations of the State's prevailing wage laws. *See* New York State Labor Law § 220, *et seq.* The State's prevailing wage laws require that public works contractors, like plaintiff, pay wages that are equivalent to the prevailing rate of similarly employed workers in the locality where the contract is being performed. *See General Electric Co. v. New York State Dep't of Labor,* 936 F.2d 1448, 1450 (2d Cir.1991). The Commissioner of the DOL is empowered to enforce compliance with these laws. *See* New York State Labor Law §§ 220(7), 220–b. As such, the Commissioner and the DOL may conduct investigations into the wages paid by public works contractors. If the DOL determines that a contractor has failed to pay its employees the prevailing wage, then the DOL may estimate the amount of underpayment and

order the sponsoring government agency to withhold commensurate payments from that contractor. *See generally* New York State Labor Law § 220–b. Once the government agency receives such a "Notice of Withholding" or "Notice of Cross–Withholding" ("Notice"), that sponsoring agency must withhold "from any payment due … sufficient moneys to satisfy" the DOL's claim of underpayment. New York State Labor Law § 220–b(2)(a)(1); *see also infra* (discussing nature of "cross-withholding").

## FACTS

### I. The DOL's Notices of Withholding and Cross–Withholding

As of January 2000, the DOL had issued several Notices of Withholding and Cross–Withholding regarding money owed to plaintiff for work completed on four different public works contracts. *See* Item 7, Exhs. B, C, S, T, and U. As a result of these Notices, the State and County Comptroller have withheld just over $1.2 million from plaintiff.

The present dispute began in April 1998, when defendant Ronald Kinn ("Kinn"), a DOL Public Work Wage Investigator, visited the Diamond D work site on Main Street and informed the supervisors there that the DOL was investigating plaintiff's compliance with prevailing wage laws. *See* Item 7, ¶ 19. Specifically, Kinn indicated that the DOL had reason to believe that Diamond D was not paying all of its workers the applicable prevailing wages, and that Diamond D was also misrepresenting the number of protected workers at sever-al of its work sites. *See id.* Kinn requested access to plaintiff's books, but was refused. Later, DiPizio told Kinn that he would provide the DOL with access to plaintiff's records only as part of a discussion between DOL and Diamond D representatives. *Id.* ¶¶ 20, 22.

In May 1998, the DOL issued a Notice of Withholding for $100,000 of the amount owed on the Main Street project. *See* Item 7, Exh. C. This initial Notice was based on plaintiff's failure to file certain payroll documents with the DOL. *See* New York Labor Law § 220(3–a)(c).[1] Plaintiff maintains that DiPizio did agree to provide the DOL with access to its records, but only in the context of a discussion between the two parties. *Id.* ¶ 25.

As a result of the May 1998 Notice of Withholding, in August 1998, the State Comptroller withheld $100,000 of the money owed on the Main Street project.[2]

In August and October 1998, Kinn continued his investigation by estimating that plaintiff had underpaid its workers approximately $424,000 for the Greiner Road job, and $385,000 for the Heim Road job. *See* Item 7, ¶¶ 30–31; New York Labor Law § 220(5)(b). These estimates were recorded in a series of computer printouts. Item 7, Exhs. D and E. Based on the printouts' estimates, in October 1998, the DOL issued two Notices of "Cross–Withholding" regarding under-payments on the Heim Road and Greiner Road projects. *See* Item 7, Exh. F. These were Notices of Cross–Withholding because the DOL cross-withheld money that was owed on the Main Street project instead of money

---

1. This type of withholding is referred to as a "payroll withholding," as opposed to the so-called "underpayment withholding." In addition to this initial payroll withholding on the Main Street project, the DOL also issued a $100,000 payroll withholding for the Heim Road project. Item 7, Exh. B. However, Michael O'Connell of the State Comptroller's Office avers that the State Comptroller has not yet withheld any money on the Heim Road project because no money has come due for work on that project. *See* Item 12, ¶ 12.

2. Michael O'Connell explains that the DOL's Notice of Withholding does not, in and of itself, effect a withholding of money from a contractor. "Funds are not actually withheld pursuant to the Prevailing Wage Law until a payment to the contractor becomes due. As a general matter, funds do not become due … until work is performed, a request for payment is accompanied with all the required paperwork, and the work, request, and paperwork [are] approved by the engineer, agency and State Comptroller." Item 12, ¶ 5.

owed on Heim Road or Greiner Road. *See* New York State Labor Law § 220–b(2)(a) (McKinney Supp.1999) (empowering DOL to "cross-withhold" money owed on one construction job because of the same contractor's alleged violations of prevailing wage laws at another job site). These Notices of Cross–Withholding covered $241,722 for the Heim Road project and $593,131 for the Greiner Road project. *See id.*[3]

After these October 1998 Notices were issued, the State Comptroller withheld money owed on the Main Street project: in December 1998, $76,287 was withheld; in January 1999, $90,731 was withheld; and in July 1999, $392,644 was withheld. Item 12, ¶ 8.

Later, in August and September 1999, Kinn recalculated the amount of alleged under-payments for the Heim Road and Greiner Road projects and estimated that there were only $317,765 in under-payments at Heim Road and $290,186 in under-payments at Greiner Road. Item 7, Exhs. Q and R. In light of these revised estimates, the DOL issued new Notices of Cross–Withholding in October 1999. In these modified Notices of Cross–Withholding, the DOL directed the State Comptroller to release $251,133 that had been Cross–Withheld for under-payments at Greiner Road and release $141,238 that had been Cross–Withheld for under-payments at Heim Road. Item 7, Exh. S and Item 12, ¶ 9.

In addition, the DOL at that time estimated that plaintiff carried an under-payment of $560,033 at the Main Street job. *see* Item 7, Exh. P, and directed the State Comptroller to withhold an additional

$618,739 of the money owed on the Main Street job. Item 7, Exh. S, and Item 12, ¶ 8. As a result of these three 1999 Notices, the State Comptroller withheld an additional $501,566 from plaintiff in December 1999. Item 12, ¶ 10.

In addition to the amounts withheld by the State, in December 1999, the DOL directed the Erie County Comptroller to withhold $100,000 of the amount owed on the Sweet Home Road project because of plaintiff's apparent failure to furnish the DOL with requested documents. *See* Item 7, Exh. U. On February 24, 2000, the County Comptroller responded to plaintiff's request for payment by withholding $100,000 from plaintiff, and by paying plaintiff the balance that was due—approximately $29,000. Item 15, ¶¶ 7–9, and Item 18, ¶ 10.

In the end, the State and the County Comptrollers have withheld just over $1.2 million from plaintiff.

## II. The DOL's Investigation of Diamond D: Allegations of Bad Faith

Diamond D claims that the DOL has failed to conduct a good faith investigation into its Notices of Withholding and Cross–Withholding. Item 7, ¶¶ 37, 52–53. First, plaintiff alleges that the DOL has engaged in a practice of "foment[ing] additional claims from Diamond D's employees, even if those employees have previously acknowledged that they have been paid in full." Item 7, ¶ 68.

Second, plaintiff states that the DOL's records reveal that the DOL received just

---

3. It is not clear why these two Notices of Cross–Withholding set forth under-payments that are greater than the amounts estimated in the 1998 printouts. Plaintiff states that Kinn admitted to plaintiff's counsel that this increase was due to the fact that the DOL assessed penalties against plaintiff through the year 2000 when it issued these Notices of Withholding in October 1998. In addition to these two Cross–Withholdings, in October 1998, the DOL issued a $439,722 Notice of Withholding for money owed on the Heim Road project. Item 7, Exh. F. However, Michael O'Connell of the State Comptroller's Office avers that the State has not withheld any money owed on the Heim Road project because no money has actually come due for work on that project. *See* Item 12, ¶ 12. Thus, this Notice of Withholding has not deprived plaintiff of any money owed on the Heim Road project.

a single employee complaint as of the time it issued its Notices of Withholding in October 1998. *See* Item 7, ¶¶ 45, 49, and Exhs. J, K, and L.

Next, plaintiff contends that the DOL has issued its Notices by unreasonably relying on interviews conducted with job site engineers and inspectors who worked for the State. On this count, plaintiff argues that the engineers and inspectors did not provide the DOL with relevant information and that the Investigators' Reports "were not reliable for the purpose" of supporting the Withholdings. *Id.* ¶¶ 50–51.

Furthermore, plaintiff asserts that the 1998 and 1999 printout estimates were unsupported by any evidence and were, in fact, based on a number of false assumptions: (1) the DOL wrongly assumed that plaintiff employed twice as many workers than it did on Greiner Road and Heim Road; (2) the DOL wrongly assumed that all workers on those jobs worked substantial overtime every workday; and (3) the DOL wrongly assumed that certain workers had higher-paying job classifications than they did. Item 7, ¶¶ 32–33, 48.[4]

Finally, plaintiff insists that defendant Kinn belied his bad faith by estimating that plaintiff's under-payments were largely attributable to plaintiff's underpaying DiPizio himself, Leo Hopkins, and John Gorski. Item 7, ¶¶ 77–79 and Exh. P. Hopkins and Gorski are DiPizio's sons-in-law and, apparently, neither of them would have enjoyed the protection of prevailing wages laws. *Id.* ¶¶ 72–76. Specifically, the record reveals that the DOL estimated that: (1) over $330,000 of plaintiff's Main Street under-payments were attributable to DiPizio, Hopkins, and Gorski, *id.* Exh. P; (2) over $120,000 of plaintiff's Greiner Road under-payments were attributable to

these three men, *id.* Exh. Q; and (3) approximately $100,000 of plaintiff's Heim Road under-payments were attributable to the same three men, *id.* Exh. R. In all, these 1999 estimates attributed over $550,000 of plaintiff's under-payments to DiPizio, Hopkins, and Gorski. Diamond D states that none of these three men ever did or would complain to the DOL regarding wages and that the DOL did not have a shred of evidence to support this aspect of the 1999 estimates. *See* Item 7, ¶¶ 72–76, 81–83.[5]

The DOL insists that it has proceeded in good faith, and blames plaintiff for much of the delay and confusion surrounding its investigation. Specifically, the DOL argues that plaintiff's failure to comply with the DOL's document requests impaired the DOL's ability to conduct an efficient investigation. *See infra* Discussion, Part I, A, 2 (containing detailed discussion of DOL's position).

### III. Imminent and Irreparable Harm to Plaintiff

Mr. Paul Clark, plaintiff's accountant, avers that the DOL's Notices of Withholding and Cross–Withholding have placed plaintiff on the brink of complete financial ruin. As a result of its inability to access the withheld funds, plaintiff has borrowed over $1.5 million so that it can continue to conduct business. Item 5, ¶ 5, and Item 7, ¶ 86. In addition, plaintiff suffered a setback when the DOL notified plaintiff's surety, The Hartford, of its Notice of Cross–Withholding for the Greiner Road project. Item 7, Exh. N. Plaintiff contends that the DOL's actions were obviously taken in bad faith, since the work on Greiner Road had already been completed

---

4. Plaintiff further alleges that Kinn and the DOL acknowledged the errors in the 1998 printouts when Kinn reduced those estimates substantially in October 1999. Item 7, ¶ 34.

5. Plaintiff claims that the DOL's bad faith in these matters is also belied by its refusal to allow Diamond D to post a bond to secure the amounts claimed by the DOL's various With-

holdings. *See* Item 7, ¶¶ 58–62. Yet, the Fourth Department of New York State's Appellate Division has arguably resolved this issue in the DOL's favor. *See In re Diamond "D" Construction Corp., New York State Dep't of Labor,* 261 A.D.2d 903, 689 N.Y.S.2d 844 (4th Dep't 1999) (holding that the DOL's payroll "withholding . . . is not a lien that may be discharged by posting an undertaking").

by the time the DOL notified The Hartford in October 1998. Item 7, ¶¶ 65–67. Plaintiff states that as a result of the DOL's actions, it cannot secure future work because The Hartford will not extend surety credit to plaintiff until the Notices of Withholding are resolved. Item 4, ¶¶ 3–5.

Furthermore, plaintiff has exhausted all of its available credit and, as a result, will soon become totally insolvent. Item 5, ¶ 5. Plaintiff seeks the release of the withheld funds so that it can pay its many creditors and salvage the corporation. *Id.* ¶¶ 7–8.

### IV. Progress of the DOL's Investigation

Plaintiff argues that the DOL has violated its right to due process by issuing Notices of Withholding and Cross–Withholding and then failing to commence a formal administrative proceeding. However, the State's papers reveal that the DOL has scheduled a hearing to be held from July 18 to July 21, 2000. Item 13, ¶ 6. This hearing will deal with a number of allegations levied against plaintiff by the DOL, and will also address all of plaintiff's withheld funds—save for the $100,000 that the DOL directed the County Comptroller to withhold on the Sweet Home Road project.

### DISCUSSION

### I. Standard of Law for Preliminary Injunction

Preliminary injunctions are "an extraordinary and drastic remedy which should not be routinely granted." *Medical Society of State of New York v. Toia,* 560 F.2d 535, 538 (2d Cir.1977). To prevail on a motion for a preliminary injunction, a plaintiff must usually show that it will suffer irreparable harm in the absence of an injunction "and *either* (a) a likelihood of success on the merits *or* (b) a sufficiently serious question going to the merits, with a balance of hardships tipping in favor of the party requesting the preliminary injunction." *Tunick v. Safir,* 209 F.3d 67, 70 (2d Cir.2000) (citation omitted).

Plaintiff and defendants disagree about which standard plaintiff must satisfy in order to prevail. Defendants insist that plaintiff must satisfy the more rigorous "likelihood of success" standard because plaintiff seeks to enjoin a government action. *See Beal v. Stern,* 184 F.3d 117, 122 (2d Cir.1999). Plaintiff contends that it may prevail by satisfying the less onerous "serious and substantial questions" standard and relies on *Haitian Centers Council v. McNary,* 969 F.2d 1326 (2d Cir.1992), *rev'd on other grounds,* 509 U.S. 155, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993), in which the court of appeals allowed plaintiffs to enjoin government action preliminarily without requiring them to satisfy the "likelihood of success" standard.

It is unnecessary for the court to resolve this dispute because plaintiff's demand for a "mandatory injunction" also gives rise to a more rigorous standard of proof. In *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27 (2d Cir. 1995), the court described a mandatory injunction as an injunction which "alter[s] the status quo by commanding some positive act." *Id.* at 34. By altering the status quo through a preliminary injunction, then, a plaintiff would receive relief that could not be undone after a trial on the merits, or at least could not be undone without considerable effort from the prevailing party. Where such relief is requested, an order granting a preliminary injunction will issue "only upon a clear showing that the moving party is entitled to the relief requested . . . ." *Id.*

In this case, plaintiff seeks to alter the status quo because it requests an order directing the State and County to pay funds currently being withheld pursuant to the DOL's Notices of Withholding and Cross–Withholding. As such, plaintiff must satisfy a higher standard in order to prevail on this motion. Specifically, plaintiff must first show that it will suffer irreparable harm in the absence of an injunction, and must then show a "clear" or "substantial" likelihood that it will prevail

on the merits of its case. *Saban,* 60 F.3d at 34.

## II. State Defendants

Before the court can address the merits of plaintiff's claims, the court must first address a pair of jurisdictional hurdles: the *Younger* abstention doctrine and Eleventh Amendment immunity.

### A. *Younger and Injunction Against Future DOL Activities*

In its second request for relief, plaintiff asks that the court to preliminarily enjoin "the DOL ... from any further seizures of plaintiff's property, or from any other actions concerning the plaintiff ...." Item 2. However, in requesting this relief, plaintiff fails to demonstrate why this court should not adhere to the doctrine of abstention set forth in *Younger v. Harris,* 401 U.S. 37, 44, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). In *Younger,* the Supreme Court held that, under most circumstances, federal courts must abstain from enjoining ongoing State criminal proceedings. Over the last twenty years, the Supreme Court has expanded *Younger*'s scope to include State civil and administrative proceedings.

> [The *Younger* doctrine has been] extended to civil proceedings in which important state interests are involved. *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975). Most recently, the *Younger* doctrine has been extended to pending state administrative proceedings as long as there is the potential for state court review of the federal litigant's constitutional claims. [*Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 626–27, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986).]

*Christ the King Regional High School v. Culvert,* 815 F.2d 219, 224 n. 5 (2d Cir. 1987).

■ Three factors must be present in order for a court to apply the *Younger* doctrine. First, there must be an ongoing state proceeding. *See Dayton Christian Schools, Inc.,* 477 U.S. at 626–27, 106 S.Ct. 2718. Second, an important state interest must be implicated in that proceeding. *Id.* Third, the federal plaintiff must have an adequate opportunity for judicial review of constitutional claims during or after the proceeding. *Id.*

Plaintiff argues that the *Younger* abstention doctrine does not apply to the present case for two alternative reasons: (1) the DOL has never commenced a formal administrative proceeding against Diamond D or, alternatively, (2) the DOL's abusive investigation of plaintiff creates an exception to the *Younger* doctrine. The court takes up these two arguments in turn.

#### 1. *Alleged Absence of State Administrative Proceeding*

■ Notwithstanding plaintiff's allegations to the contrary, *see* Item 7, ¶¶ 24 and 38, the record reveals that there is an ongoing administrative proceeding involving plaintiff and the DOL's Notices of Withholding. Indeed, the DOL is prepared to press forward with four days of hearings from July 18 to 21, 2000. *See* Item 13, ¶¶ 3–7.[6] Furthermore, under *Younger,* there is an important State interest at issue in the ongoing administrative proceeding: namely, enforcement of and compliance with the State's prevailing wage laws. Indeed, New York State's highest court has recently observed that the "statutory procedures, powers and duties of the [DOL] Commissioner and available remedies and sanctions under section 220 and the other provisions of article 8 of the Labor Law all have the earmark of a powerful administrative mechanism for the enforcement of a strong public policy." *Cayuga–Onondaga Coun-*

---

**6.** As a practical matter, this court would be less capable of judging the accuracy of the DOL's Notices of Withholding. Presumably, the DOL's Administrative Law Judge has heard a great number of these cases and has certainly received guidance from the State courts on how to administer these proceedings properly.

*ties v. Sweeney,* 89 N.Y.2d 395, 654 N.Y.S.2d 92, 95, 676 N.E.2d 854 (Ct.App. 1996). Finally, Article 78 of New York State's CPLR gives plaintiff an opportunity to secure judicial review of the DOL's determination.

Thus, each of the three elements in the *Younger* test are satisfied in this case. Absent a showing of the State's bad faith, *Younger* requires this court to abstain from interfering with the DOL's ongoing administrative proceedings. Thus, the foregoing analysis shows that plaintiff fails to show a clear likelihood of prevailing on its request for an injunction of the DOL's future proceedings against plaintiff.

Notwithstanding the above, at first blush, a delay of up to two years before a post-deprivation hearing would appear to be unreasonable. The DOL's position that the delays were caused in part by plaintiff's obstructive tactics does not completely resolve the issue. Without proof of good cause, such a delay strikes this court as too long to comport with plaintiff's due process rights. On the other hand, although plaintiff complains now about these delays in scheduling a hearing, plaintiff never petitioned a State court for a writ of mandamus so that a more prompt hearing could be held. In fact, plaintiff was not heard to complain of these delays until it came to this court, by which time the DOL had already set dates for the hearing. In any event, under the present circumstances and based on the present record, the court cannot make a determination that the delays have clearly been of a Constitutional magnitude.

### 2. *Allegedly Abusive Investigation and Bad Faith Prosecution by DOL*

Plaintiff also urges that *Younger* is inapplicable in light of the DOL's history of abusive investigations into plaintiff's compliance with the prevailing wage laws. *See* Item 3, pp. 15–17. In support of its argument, plaintiff cites to the decision in *Cul-*

*len v. Fliegner,* 18 F.3d 96, 103–04 (2d Cir.1994).

> [F]ederal courts should still afford injunctive relief to a plaintiff who successfully establishes "the kind of irreparable injury, above and beyond that associated with the defense of a single prosecution brought in good faith, that ha[s] always been considered sufficient to justify federal intervention." *Younger,* 401 U.S. at 48, 91 S.Ct. 746. Intervention would still be warranted upon a showing of "bad faith, harassment or any other exceptional circumstance that would call for equitable relief." *Id.* at 54, 91 S.Ct. 746. Generally, for such a showing to be made, the party bringing the state action must have no reasonable expectation of obtaining a favorable outcome. But, a refusal to abstain is also justified where a prosecution or proceeding has been brought ... in bad faith or for the purpose to harass.

*Cullen,* 18 F.3d at 103–04 (citation omitted).

Under *Cullen,* plaintiff insists that the DOL's persistent harassment and abuse of Diamond D demonstrates that its investigations have been conducted in bad faith and that plaintiff has no reasonable expectation of obtaining a favorable outcome. "[T]he prejudice resulting from the totality of defendants' conduct has made it impossible to conduct a fair adjudicatory process under any circumstances." Item 7, ¶ 101. Among other things, plaintiff alleges that the DOL has: (a) solicited false wage claims from plaintiff's workers; *see* Item 7, ¶ 68; (b) based its investigation and withholdings on only one employee complaint, *see* Item 7, ¶¶ 45, 49, and Exhs. J, K, and L; (c) gathered information from State engineers and inspectors that was "not reliable for the purpose" of supporting the Withholdings, *id.* ¶¶ 50–51;[7] (d) created specious and unfounded estimates of wage under-payments for 1998 and 1999, *see* Item 7, ¶¶ 32–33, 48;[8] and (e) committed

---

7. The court finds these particular allegations to be of little value because they are conclusory in nature and are based on hearsay testimony.

8. Plaintiff further alleges that Kinn and the DOL acknowledged the errors in the 1998 printouts when Kinn reduced those estimates substantially in October 1999. Item 7, ¶ 34.

the egregious error of largely attributing plaintiff's under-payments to DiPizio, Leo Hopkins, and John Gorski. Item 7, ¶¶ 77–83 and Exh. P (indicating 1999 printouts estimated that over $550,000 of plaintiff's under-payments were attributable to these three men).

First, the court rejects plaintiff's allegation that the DOL "fomented" false wage claims from Diamond D's workers because the present record simply does not support such an inference. Plaintiff has only submitted a copy of a letter that Kinn apparently sent to several of Diamond D's workers, in which Mr. Kinn encourages the worker to contact the DOL regarding its investigation into Diamond D's compliance with prevailing wage laws. Item 7, Exh. O. The court sees nothing evil in this. Similarly, the court rejects plaintiff's conclusory allegation that the DOL unreasonably relied on information received from State engineers and inspectors who were present at Diamond D work sites. Moreover, the court observes that Kinn was not only entitled to proceed with an investigation on the basis of a single complaint from one worker, but was also entitled to conduct an investigation without having received a complaint at all. *See* New York Labor Law § 220–b(2)(a) (McKinney 1986 & Supp.1999) (granting DOL power to start investigation of its own initiative). Likewise, the court finds that, in all likelihood, it would have been appropriate for Kinn to rely on conversations that he had with State engineers and inspectors who had personal knowledge of the Diamond D job sites. In sum, the court finds no evidence of bad faith in any of these allegations.

As to plaintiff's claim that the DOL asserted specious wage claims and recklessly attributed under-payments to DiPizio, Hopkins, and Gorski, the court simply finds that the present record cannot support a conclusive finding in either party's favor.

Furthermore, the DOL insists that these delays are either justified, or that they should at least be excused, because "Diamond D's role in refusing to file requested payroll records and commencing actions in state and federal court [have] contributed to the delay complained of." Item 19, pp. 18–19. On this count, John Loughlin, the DOL attorney in charge of the investigation, avers that plaintiff has consistently failed to "cooperate[ ] in the [DOL's] investigation and . . . has not submitted all the information requested by the [DOL]." Item 13, ¶ 3. Further, Loughlin states that plaintiff's failure to supply the DOL with requested documents has impaired the accuracy and timeliness of the DOL's investigation: "the drafting of the Notice [for Hearing] requires examination of numerous documents to verify the number of workers performing work on the various projects, the identity of the workers, the type of work performed by the workers, and the hourly wage and supplement paid to each worker." *Id.* Thus, the DOL insists that plaintiff's failure to comply fully with rudimentary DOL document requests has greatly impaired the DOL's ability to conduct an efficient investigation.

Finally, the court takes notice of two facts. First, while the court cannot guess at the reason for Kinn's recalculations—whether Kinn simply made an error or whether plaintiff's failure to cooperate affected the initial estimates—the court now notes that Kinn's willingness to admit his errors tends to rebut plaintiff's claim of Kinn's bad faith or improper motive.[9] Second, plaintiff may well have further delayed the DOL's investigation by initiating a collateral lawsuit in which plaintiff asked a State court to compel the DOL to accept a bond so that certain payroll withholdings could be released. Although the

---

9. Presumably, Kinn's under-payment estimates created some kind of paper trail—various papers and records. Although the DOL produced the so-called "master file" prior to argument, neither party submitted the master file, nor papers and documents related to Kinn's audits. The court finds it curious that the record does not contain any such papers or data.

trial court granted Diamond D's petition, the Fourth Department reversed and held that "the withholding of payment is not a lien that may be discharged by posting an undertaking pursuant to the Lien Law" and "that to allow [Diamond D] to vacate the notice to withhold payment by posting an undertaking would undermine [the DOL's] ability to require compliance with [the prevailing wage laws]." *In re Diamond D Construction Corp., New York State Dep't of Labor*, 261 A.D.2d 903, 903, 689 N.Y.S.2d 844 (4th Dep't 1999); *see also supra* n. 5.

Based on the present record, the court finds that the DOL may well have failed to conduct a timely or efficient investigation of plaintiff's compliance with the prevailing wage laws. Yet, the court cannot say under *Cullen* that the DOL has conducted its investigation or issued its Notices of Withholding in bad faith or with an intent simply to harass plaintiff. As such, the court finds, at this stage, that the *Younger* abstention doctrine should control and denies plaintiff's motion for a preliminary injunction against the DOL's administrative proceedings.

### 3. *Practical Effect of Younger Abstention*

Here, the court observes that its ruling under *Younger* effectively precludes the court from ruling on plaintiff's claim for monetary relief. *See infra* Discussion, Part II, B. That is, the court has already held that it will not enjoin the DOL's administrative proceedings against plaintiff. Therefore, the issue of the withheld funds will be squarely before the DOL's Administrative Law Judge during the hearings of July 2000. As such, it would be inappropriate for this court now to rule on whether the withheld funds should be released to plaintiff.

In light of the foregoing, the only relief that the court might prudently award would be an order directing the DOL to hold its hearings without any further delay. *See, e.g., Barsons Construction v. Ross*, 85 A.D.2d 755, 445 N.Y.S.2d 261 (3d Dep't 1981); and *Palmer Construction v. Hines*, 154 Misc.2d 248, 250, 584 N.Y.S.2d 271 (1992) (noting that order directing DOL to hold hearings is appropriate relief where DOL has unduly delayed holding of hearings). Again, the court finds it curious that plaintiff never petitioned the appropriate State court to issue a writ of mandamus that would have directed the DOL to hold its post-deprivation hearing without any further delay. At oral argument, the court pressed plaintiff's counsel on this issue several times, but never received an altogether satisfactory answer. In any event, since the DOL has already scheduled those hearings for July 2000, such relief now seems moot.

Still, plaintiff maintains that the "prospect of adjudicating these massive claims in three days in July, with little or no discovery or financial resources to prepare a defense, leaves little room for confidence that anything resembling justice will be done under the circumstances." Item 22, p. 18. As a threshold matter, the court notes that it has already addressed and rejected the essence of this argument from plaintiff. *See supra.*[10] Furthermore, the court observes that the DOL has actually set aside four days for hearings, not just three.

Finally, as an aside, the court expresses the following opinion. The delays in holding post-deprivation hearings in this case may indeed be unreasonable, regardless of whether plaintiff played a role in creating them. Further, it is in the public interest that the DOL hear and resolve this case as expeditiously as possible. As such, the court is confident that the DOL's Administrative Law Judge will grant any extra time and attention that might be necessary

---

**10.** With respect to plaintiff's discovery concerns, the court parenthetically notes that plaintiff's attorneys have already secured the so-called "Master File" that the DOL has compiled regarding Diamond D. *See* Item 22, p. 15. Next, the court observes that although plaintiff claims that it will be unable to finance a defense at the DOL hearing, plaintiff apparently has the wherewithal to bring the immediate section 1983 action.

so that plaintiff may receive a truly fair hearing.

### B. *Monetary Relief*

#### 1. *Money Award from State Treasury*

By its Motion for a Preliminary Injunction, plaintiff requests the following relief:

An order directing the County Defendants and the [State] Defendants to pay to plaintiff forthwith all sums owed to plaintiff pursuant to the contracts referred to in the complaint. These defendants are currently withholding such sums pursuant to Notices of Withholding issued by one or more of the DOL defendants.

Item 2. Thus, plaintiff demands monetary relief from the State defendants.

■■■ In *Edelman v. Jordan,* the Supreme Court set forth the now well-settled rule that "a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment." 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). In addition, the Eleventh Amendment bars a plaintiff from recovering retroactive damages against a State or a State official in his or her official capacity. *See Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

More recently, the Second Circuit elaborated on *Edelman:* "The Eleventh Amendment provides a state, as well as its agencies and its officials acting in their official capacities, with protection from suits in federal court for damages for past wrongs. In general, federal suits against such defendants for monetary awards out of state funds are barred." *Tekkno Laboratories, Inc. v. Perales,* 933 F.2d 1093, 1097 (2d Cir.1991) (citing *Edelman* ).

In addition to providing a pertinent statement of the law, *Tekkno* is factually similar to the present case. In *Tekkno,* a medical provider brought a section 1983 suit against the State Commissioner of Social Services and challenged withholdings of reimbursement payments that were effected without notice or an opportunity to be heard. *Id.* at 1094. In short, the provider claimed that it had been deprived of a property interest without due process. The court of appeals reversed the district court's granting of a preliminary injunction, and found the plaintiff's "attempts to parry the Eleventh Amendment defense" were "specious," "frivolous," and "lack[ing] even facial plausibility." *Id.* at 1098.

Further, the court rejected the provider's theory that the release of withheld funds would be a form of prospective relief that "merely directs that the illegal deprivation shall not continue to Tekkno's further injury." *Id.* In the end, the court held that the court's order to the State Commissioner to repay funds withheld prior to the date of the injunction was an exercise of power violative of the Eleventh Amendment, since the Eleventh Amendment barred the district court from directing the State to release moneys subject to a withholding. *Id.*

■■■ The court finds that the present case is substantially similar to *Tekkno* because Diamond D, like the plaintiff laboratory in *Tekkno,* seeks an order directing the State to release withheld funds. Plaintiff argues that this is a different case because there is no dispute that Diamond D is owed payment from the State, whereas in *Tekkno* the State Medicaid agency disputed whether the plaintiff laboratory was actually owed for services the lab had billed. *See* Item 22. p. 8. The court is not persuaded by plaintiff's attempts to distinguish *Tekkno.* As with *Tekkno,* this case also involves a dispute over whether plaintiff is actually owed the money being withheld by the State.

Under *Edelman,* and the more recent authority of *Tekkno,* plaintiff's request is likely barred by the Eleventh Amendment.

#### 2. *Relationship Between Withheld Funds & State Treasury*

##### a. *Withheld funds as Segregated Funds*

Plaintiff also argues that the State is not entitled to Eleventh Amendment immunity

because the funds at issue are not part of the State's general treasury, and that, as a result, an award in this case will not affect the State fisc. In *Conrad v. Perales,* this court recognized the line of cases which held that:

> Eleventh Amendment immunity does not protect the state from retroactive money awards where such an award would be paid from a segregated fund held by the state.... [In addition, one court has held] that there is no Eleventh Amendment immunity when "state funds are held in a separate account ... and an award limited to those funds will not affect the state's budgetary decisions ... [because] where the state will be unaffected by an award, its consent to suit and waiver of sovereign immunity seem unnecessary."

92 F.Supp.2d 175, 185 (W.D.N.Y.2000) (citation omitted).

▄▄▄ In addition, this court has also acknowledged that the State typically "bears the burden of establishing ... entitlement to Eleventh Amendment immunity." *Id.*[11] Plaintiff argues that the State has actually *conceded* that the State fisc would not be affected by a judgment in this case. *See* Item 22, pp. 4–5. Plaintiff cites to the Affidavit of Michael O'Connell of the State Comptroller's Office, in which O'Connell states: "The proceeds of a public construction contract are maintained in a joint custody checking account of the New York State Treasurer and New York State Comptroller...." Item 12, ¶ 4.

Seizing on this representation, plaintiff argues: "It thus appears that such 'proceeds of a public construction contract' have been segregated from the general funds of the State and are being held in this checking account for payment under the contract." Item 22, p. 4. The court disagrees with plaintiff's reading of Mr. O'Connell's statements. Contrary to plaintiff's reading, it appears to the court that a joint checking account maintained

by the State Treasurer and Comptroller is, in fact, the State's general treasury.

b. *Withheld Funds "held in trust"*

Plaintiff also argues that the State does not enjoy Eleventh Amendment immunity with respect to the withheld funds because an order to release the withheld funds would have no effect on the State's budgetary needs and decisions, nor would it have any effect on the State's general treasury. *See* Item 22, pp. 6–8. Here, plaintiff again relies on Mr. O'Connell's affidavit, in which O'Connell explains:

> Funds are not actually withheld pursuant to the Prevailing Wage Law *until a payment to the contractor becomes due.* As a general matter, funds do not become due ... until work is performed, a request for payment is accompanied with all the required paperwork, and the work, request, and paperwork [are] all approved by the engineer, agency, and State Comptroller. *Only at that point ... are there funds due to the contractor that can be withheld* pursuant to a notice to withhold under the Prevailing Wage Law.

Item 12, ¶ 5. In essence, plaintiff infers that "if the State is withholding funds, then the State is conceding that funds are owed to plaintiff." The court agrees and finds that, according to the O'Connell Affidavit, the State will only withhold funds that are otherwise owed to plaintiff.

▄▄▄ Plaintiff takes this argument one step further and asserts that the withheld funds are actually no longer "part of" the State's treasury, since the State has already conceded that the funds are owed to plaintiff and that the withheld funds are no longer available for the State's general budgetary needs. Thus, plaintiff reasons, the State treasury would not be "affected" by a judgment in this case since the State treasury has already planned on the funds being spent and, but for the DOL's with-

---

**11.** The court does not attempt to address the issue of how plaintiff's substantial burden as the movant in this case might affect the State's burden.

holdings, would have already paid plaintiff the withheld funds.

By this argument, however, plaintiff recycles an argument that the Second Circuit has rejected in the past. That is, plaintiff asserts that there is no Eleventh Amendment immunity where the State indisputably owes plaintiff the withheld funds and where, as a result, plaintiff has an irrefutable property interest in the funds owed. However, in *Yorktown*, the court of appeals rejected this very same reasoning: "Yorktown's argument fails ... because it seeks to craft a distinction between monetary damages and money in which plaintiff has a property interest—a distinction irrelevant to Eleventh Amendment analysis." *Yorktown Medical Laboratory, Inc. v. Perales*, 948 F.2d 84, 87–88 (2d Cir.1991) (citing *Edelman*, 415 U.S. at 668, 94 S.Ct. 1347).

By the foregoing analysis, the court does not foreclose the discussion of Eleventh Amendment immunity in this case. After all, the present motion is one for a preliminary injunction, not for dismissal. Nevertheless, this analysis persuades the court that plaintiff has failed to establish a clear or substantial likelihood that it will prevail in its attempt to assert a claim for monetary relief against the State. Therefore, the court denies plaintiff's motion to the extent that it demands a payment of monetary relief from the State.

### C. *Prospective Injunctive Relief*

Although the court has held that the Eleventh Amendment bars plaintiff's demand for a monetary award to be paid from the State treasury, the court's inquiry does not end there. Instead, the court must also determine whether plaintiff may secure prospective injunctive relief and, in so doing, also secure related monetary relief.

The Supreme Court has made clear that the "Eleventh Amendment does not prevent federal courts from granting prospective injunctive relief to prevent a continuing violation of federal law." *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 88

L.Ed.2d 371 (1985) (citing *Ex Parte Young*, 209 U.S. 123, 155–56, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). Furthermore, the Eleventh Amendment does not necessarily bar awards of prospective relief even though such relief will impact on the State treasury. *See Association of Surrogates and Supreme Court Reporters v. State of New York*, 940 F.2d 766, 774 (2d Cir.1991). In this way, plaintiff argues that the court should prospectively enjoin the DOL's enforcement of its Notices of Withholding and Cross–Withholding. Obviously, such an order would have the necessary effect of releasing the withheld funds.

As a threshold matter, the court finds that plaintiff's claim for such prospective relief presents one simple problem: plaintiff has not moved the court to enjoin the DOL from enforcing its Notices of Withholding and Cross–Withholding. Rather, plaintiff's motion requests only two forms of relief: (1) an order releasing the withheld funds and (2) an order preliminarily enjoining the DOL from proceeding against plaintiff with future administrative actions. *See supra*. Plaintiff has not, however, asked the court to enjoin the DOL's Notices, which were previously issued in May 1998, October 1998, and October 1999. *But cf. Meadow Valley Contractors, Inc. v. Johnson*, 89 F.Supp.2d 1180 (D.Nev.2000) (involving § 1983 action challenging application of prevailing wage laws where plaintiffs asked court to enjoin Labor Commissioner from enforcing wage laws against them).

Yet, the court is not inclined to deny relief simply because plaintiff has not used the "magic words." To do so would exalt form over substance. Diamond D has made the DOL's Notices of Withholding and Cross–Withholding the subject of its present motion by attacking the Notices as a violation of its due process rights. Therefore, the court will address the issue of whether it may grant prospective injunctive relief to plaintiff and thereby order that the withheld funds be released in connection with the injunctive relief.

In *New York City Health & Hospitals Corp. v. Perales,* the court of appeals held that "the Eleventh Amendment does not bar federal courts from issuing an injunction against a state official who is acting contrary to federal law when such is necessary to vindicate the supremacy of that law ...." 50 F.3d 129, 135 (2d Cir.1995). Moreover, courts should not read the Eleventh Amendment "as precluding prospective relief having a *future* financial effect on a state treasury, even if the amount is substantial. Nor does the Amendment bar certain monetary awards, like attorney's fees or fines, which are matters *ancillary* to a grant of prospective relief against a state." *Id.* (emphasis added). Under *New York City Health & Hospitals,* then, the court of appeals has identified two varieties of monetary relief that are not barred by the Eleventh Amendment. First, plaintiffs may secure monetary relief from the State to the extent that the State must expend its resources in order to pay for the costs of prospective injunctive relief. *See, e.g., Kostok v. Thomas,* 105 F.3d 65 (2d Cir.1997). Second, plaintiffs may secure monetary relief from the State to the extent that the monetary relief is only ancillary to the prospective injunctive relief. *See, e.g., Kraebel v. Commissioner of the New York State Division of Housing and Community Renewal,* 1995 WL 469707 (S.D.N.Y. Aug.8, 1995).

In the present case, plaintiff cannot avoid the Eleventh Amendment's effects by arguing that a release of the withheld funds would merely represent the costs of conforming its future conduct to an injunctive order. However, plaintiff also attempts to circumnavigate the Eleventh Amendment by arguing that a release of the withheld funds would be ancillary to a prospective injunction against the DOL's Notices of Withholding and Cross–Withholding. Here, the court rejects plaintiff's argument and finds that, under *Tekkno,* 933 F.2d 1093, a release of the withheld funds would be *central,* rather than ancillary, to an order enjoining the DOL's Notices of Withholding. Indeed, the only

purpose of issuing such an order would be to release the withheld funds to plaintiff. Plaintiff cannot attempt to evade the effects of the Eleventh Amendment by recharacterizing its claim in this way. "Any claim for retroactive monetary relief, under any name, is barred." *Kostok v. Thomas,* 105 F.3d 65, 68 (2d Cir.1997).

Plaintiff also attempts to evade the Eleventh Amendment by relying on the Second Circuit's decisions in *Association of Surrogates and Supreme Court Reporters v. State of New York,* 940 F.2d 766, 774 (2d Cir.1991), and *Condell v. Bress,* 983 F.2d 415, 419–20 (2d Cir.1993). In both of those cases, employees of New York's unified court system challenged a State law that abrogated certain provisions in their collective bargaining agreement.

> [T]he legislature imposed a "lag payroll" on the nonjudicial employees of the Unified Court System.
>
> . . . .
>
> The effect [of the legislation was] to delay payment of the affected employees' salaries until two weeks after those salaries are earned.... To phase in this two-week lag, the comptroller ... adopted an "alternative procedure" for paying salaries beginning November 7, 1990. Under that procedure, the affected employees were paid nine days' salary for the ten days worked in each pay period for ten two-week periods. Thus, for the fiscal year which ended March 31, 1991, affected employees were paid for 50 weeks' work instead of 52. The two weeks' pay thus withheld will be payable to the employees at the termination of their employment with the state at the rate of the pay applicable to them at the time of termination.

940 F.2d at 769. Observing that "the contract clause ... is especially vigilant when a state takes liberties with its own obligations," *id.* at 773, the court held for the plaintiffs and found that "[t]he contract clause ... must prohibit New York from dishonoring its existing contractual obli-

gations when other policy alternatives are available," *id.* at 774.

The court declines to rely on either *Surrogates and Supreme Court Reporters* or *Condell* because the facts at issue in those cases are so dissimilar from those in the present case. Both of those cases dealt with the State's attempt to legislate away its contractual obligations and the court's decision to enjoin the State's lag-payroll statute by virtue of the contracts clause. In both cases, the court of appeals concluded that payment of the unpaid wages would be ancillary to enjoining the lag-payroll statute prospectively. As a result of the unique factual and legal nature of those cases, the court finds that they do not inform the present analysis.

Rather, as stated *supra,* the court finds that the facts in the present case are substantially similar to those addressed in *Tekkno,* as well as those addressed in *Yorktown Medical Laboratory, Inc. v. Perales,* 948 F.2d 84, 90 (2d Cir.1991) (following *Tekkno* ). That is, plaintiff seeks an order releasing funds that are being withheld by the State as part of a dispute over how much of the withheld funds are actually owed to plaintiff. Under such circumstances, the application for a preliminary injunction must be denied.

### III. County Defendants

Unlike the State defendants, the County defendants may not rely on Eleventh Amendment immunity in order to defeat plaintiff's motion for a preliminary injunction. Therefore, it is necessary to determine whether there is a clear or substantial likelihood that plaintiff will prevail on its claim that the County, along with the DOL, has withheld payment in violation of plaintiff's right to due process. As stated *supra,* plaintiff must establish that it will suffer irreparable injury without a preliminary injunction, and must show a clear or substantial likelihood that it will prevail on the merits. *See supra,* Discussion, Part I.

### A. *Irreparable Injury*

The court recognizes that " '[t]he destruction of a business has long been held to constitute the type of irreparable injury for which these is no adequate monetary remedy.' " *Kamine/ Besicorp Allegany L.P. v. Rochester Gas & Elec. Corp.,* 908 F.Supp. 1180, 1187 (W.D.N.Y.1995) (quoting *Travellers Int'l AG v. Trans World Airlines, Inc.,* 722 F.Supp. 1087, 1105 (S.D.N.Y.1989)). With respect to the County defendants, however, plaintiff must show that it will suffer irreparable harm *in the absence* of a preliminary injunction. The court finds that it is doubtful that a preliminary injunction against the County would save plaintiff from the irreparable harm it claims. That is, plaintiff's moving papers establish that plaintiff has past-due payables of $250,000, current payables of $200,000, fixed monthly costs of $100,000, currently due insurance premiums of $70,-000, and monthly loan interest payments of $15,000. *See* Item 5, ¶¶ 5, 8. In addition, plaintiff contends that it currently has no significant source of income, *see* Item 7, ¶¶ 87–90, and that its present financial situation and surety credit have made it impossible to bid on new construction jobs, *see* Item 3, p. 9.

Thus, plaintiff claims that it has no means of generating significant revenue and that it needs well over $600,000 to continue as a viable corporation. The County's withholding is $100,000. Thus, it appears doubtful to the court that a preliminary injunction against the County would prevent irreparable harm to plaintiff.

### B. *Clear or Substantial Likelihood of Success*

In order to demonstrate a clear or substantial likelihood of success on the merits, plaintiff must first show that the County defendants, along with the DOL, have deprived it of a constitutional right, and that the deprivation occurred without due process of law. *See Mathews v. Eldridge,* 424 U.S. 319, 332–33, 96 S.Ct. 893,

47 L.Ed.2d 18 (1976). First, the parties agree that plaintiff has a Constitutional right at stake in the present case, *see* Item 3, p. 10 and Item 17, p. 6, since it is "well established that a contractor has a right to timely payment for work it performs under a contract with a state agency, and that such right is a property interest protected by the due process clause." *General Elec. Co. v. New York State Dep't of Labor,* 936 F.2d 1448, 1453 (2d Cir.1991).

Thus, the issue here is whether the County and the DOL can satisfy the requirements of due process by providing plaintiff with a post-deprivation hearing regarding the withheld funds. *See* New York State Labor Law §§ 220(8), 220–b(2)(c) (providing for administrative hearing regarding DOL withholdings).

■ In determining how long a delay is justified or whether a delay is so lengthy so as to "become a constitutional violation," *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 547, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), the district court must "examine the importance of the private interest and the harm to this interest occasioned by the delay; the justification offered by the Government for the delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken." *Federal Deposit Insurance Corp. v. Mallen,* 486 U.S. 230, 242, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988).

As a threshold matter, the court observes that there will ultimately be a five-month delay between the County's withholding of $100,000 and the July 2000 hearing. *See* Item 15, ¶¶ 7–9.

### 1. Harm to Important Private Interest

■ First, for reasons discussed *supra,* the court finds that plaintiff has not clearly established that the County and the DOL have harmed Diamond D by withholding $100,000 and delaying a hearing for up to five months. The problem with plaintiff's proof is one of causation. While plaintiff's moving papers establish a grim picture of its finances, it is not clear that the Coun-

ty's withholding is the proximate cause of plaintiff's financial difficulty. *See supra,* Discussion Part III, A.

### 2. Government's Justification

Second, the County and the DOL have withheld $100,000 from plaintiff—a so-called "payroll withholding"—in an effort to compel plaintiff's compliance with the prevailing wage laws of New York State. *See* New York Labor Law § 220(3–a)(c); *see also supra* footnote 2. The court finds that withholding funds from a non-compliant public works contractor is related to the important government interest of ensuring compliance with the State's prevailing wage laws. *See Cayuga–Onondaga Counties,* 654 N.Y.S.2d at 95, 676 N.E.2d 854 (calling section 220 of the Labor Law "a powerful administrative mechanism for the enforcement of a strong public policy").

### 3. Risk of Mistaken Interim Decision

As a practical matter, the issue of whether a contractor has filed requested documents with the DOL seems straightforward—not the sort of issue that would typically give rise to a decision that is mistaken on its facts. *See* Item 17, p. 7.

In any event, the court finds that plaintiff has not shown a clear likelihood that the County's withholding is the result of a mistaken decision. Plaintiff insists that it satisfied the requirements of section 220(3–a)(c) when it produced its Sweet Home Road payroll records for inspection at the offices of DOL counsel in December 1999. *See* Item 7, Exh. V. Yet, the record does not establish that plaintiff actually *filed* sworn payroll records with the DOL. Instead, it appears that plaintiff may have continued to insist on producing its payroll records only under certain conditions. *See, e.g.,* Item 7, ¶¶ 20, 25. As such, the record leaves open the possibility that the County and the DOL were justified in continuing to withhold the $100,000 from plaintiff for its failure to abide by section 220(3–a)(c).

Therefore, the court finds that under *Mallen*, plaintiff has not established a clear likelihood of prevailing on its claim that the DOL's five-month delay in resolving the County's $100,000 withholding has violated its right to due process. Thus, the court denies plaintiff's motion for a preliminary injunction seeking the release of the County's withheld funds.[12]

## CONCLUSION

At this point, it is not entirely clear to the court what the parties may seek in the way of further proceedings, especially in light of the fact that the DOL's hearings are set to commence in less than one month. In any event, by this opinion and order the court limits its ruling to plaintiff's motion for a preliminary injunction. Again, for all of the reasons discussed herein, the court now denies that motion.

So ordered.

12. Although the court has dealt thoroughly with the State defendants under both the Eleventh Amendment and under the *Younger* abstention doctrine, the court also finds that plaintiff would fail in its petition under *Mallen's* three-part test for reasons that are substantially similar to those set forth in the court's reasoning in Part II, A, 1–2 of the Discussion, *see supra*.